ace

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| EMERGIS TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-4069-JAR |
| | ) | |
| CABLE ONE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM ORDER CONSTRUING DISPUTED CLAIMS

This matter is before the Court on the parties' request that the Court construe certain

patent claim language in accordance with *Markman v. Westview Instruments, Inc.*[1]  Plaintiff,

Emergis Technologies, Inc., has submitted a motion for construction of the disputed claim terms

(Doc. 61), and defendant, Cable One, Inc., has responded (Doc. 62).  In addition, the Court held

an evidentiary hearing on the *Markman* issues on August 22, 2006.  Having reviewed the parties'

filings and the evidence presented at the hearing, the Court construes the disputed terms and

phrases as set forth below.

## I.      Background

Emergis Technologies, Inc. ("Emergis") brings this action against Cable One, Inc.

("Cable One"), claiming that Cable One's internet billing system is infringing on a patent owned

by Emergis.[2]  Emergis owns United States Patent No. 6,044, 362 ("the '362 patent"), entitled

---

[1]52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

[2]Emergis also brought this action against Midwest Energy, Inc. and Nuvox Communications of Kansas, Inc. These defendants have settled with Emergis, and are now terminated as parties to the case.  Cable One is the only remaining defendant in this action.

"Electronic Invoicing and Payment System," that is a system for automated electronic billing and payment.  The '362 patent claims methods for electronic invoicing, presentment, and payment ("EIPP").

The inventions claimed in the '362 patent were developed by R. Alan Neely, the founder and president of InvoiceLink, a provider of vended EIPP services to businesses.  InvoiceLink provided software to businesses that established online billing systems.  After a customer of the business enrolled in the system, the system would present bills to the customer.  Then the customer would make payments online through the system.  The software took payments from the customer and routed them to the business's financial institution.

Emergis subsequently acquired InvoiceLink and its intellectual property, including the '362 patent.  After the acquisition, Emergis continued to offer EIPP services to businesses, but recently Emergis has abandoned offering these services in the United States and instead licenses its patent rights to other entities wishing to offer EIPP services.  In connection with its licensing, Emergis has instituted several patent infringement lawsuits.

Cable One is a provider of cable, digital phone and internet services.  Cable One contracts with a third party, Cable Data, which generates bills for Cable One's services and mails paper invoices to Cable One's customers.  Cable One customers can pay their bills in person, through the mail, or over the phone.  Recently, Cable One has offered its customers the option of paying their bills electronically via the internet.  Cable One contracts with a third party, Crescent Systems, to handle payments made electronically over the internet.  Emergis claims that this system infringes on the '362 patent.

2

## II.    Applicable Law

The determination of patent infringement is a two-step process.  In resolving a claim of patent infringement, a court must "first determine the meaning and scope of the patent claims at issue before the factfinder may resolve whether the accused device infringes the patent claims as construed by the court."[3]  The construction of a patent, including terms of art within its claim, is a question of law.[4]  In construing a patent claim, the Court looks to the three sources of intrinsic evidence of record: the claims; the specification; and the prosecution history (a.k.a. "the file wrapper" or "the file history").[5]  The Court may also consult extrinsic evidence to aid its understanding of claim terms.[6]

### A.    Intrinsic Evidence

The first step in claim construction is an examination of the language of the claim.[7] Patent claims are the numbered paragraphs at the end of the patent's specification.  A construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claim itself, but consults these sources to give the necessary context to the claim language.[8]  As a starting point, courts accord "claim terms their ordinary and accustomed

---

[3]*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

[4]*See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 383–91 (1996).

[5]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted).

[6]*See Pitney Bowes, Inc. v. Hewlett-Packard Corp.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

[7]*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001) (citing *Hockerson-Halberstadt, Inc. v. Avia Group Int'l., Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000)).

[8]*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1555 (Fed. Cir. 1997), *overruled on other grounds by Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998).

meaning as understood by one of ordinary skill in the art."[9]  "Accordingly, a technical term used in a patent claim is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean."[10]  In constructing the person of ordinary skill in the art, the court should consider the educational level of the inventor, the type of problems encountered in the art, the prior art solutions to the problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of workers in the field.[11]

A heavy presumption exists that the terms in a claim are to be afforded their ordinary and customary meaning.[12]  The patentee may, however, choose to be his own lexicographer and thus may use terms in a manner other than their ordinary meaning.[13]  In such a case, the court must examine the intrinsic evidence to determine whether the patentee has given the term an unconventional meaning.

Claims also must be read in view of the specification, which contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention.[14]  Thus, the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication, and "is the single best guide to the meaning of a disputed term."[15]  However, the specification "does not delimit the right to exclude.  That is

---

[9]*Dow Chem. Co.*, 257 F.3d at 1372 (citation omitted).

[10]*Id.* (citation omitted).

[11]*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000) (citation omitted).

[12]*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

[13]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[14]*See* 35 U.S.C. § 112; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

[15]*Vitronics*, 90 F.3d at 1582.

the function and purpose of the claims."[16]

In addition, "the court should consider the patent's prosecution history . . . to ascertain the true meaning of the language used in the patent claim."[17]  "This 'undisputed public record' of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims."[18]  "[A]rguments made during prosecution shed light on what the applicant meant by its various terms."[19]  The Court must examine the prosecution history to determine whether the patentee has "relinquished a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference."[20]  In this way, the prosecution history limits the interpretation of claims so as to exclude any interpretation that was disclaimed during prosecution.[21]  While the prosecution history aids understanding of the language used in the claims, it "cannot enlarge, diminish, or vary the limitations in the claims."[22]

**B.     Extrinsic Evidence**

"'Extrinsic evidence' is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles."[23]  The court may not "*rely* on extrinsic evidence in claim construction to contradict the meaning of

---

[16]*Markman*, 52 F.3d at 980.

[17]*Id.* at 979–80.

[18]*Id.* at 980.

[19]*Laitram Corp. v. Morehouse Indus.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998).

[20]*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001).

[21]*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

[22]*Markman*, 52 F.3d at 980.

[23]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

claims discernible from thoughtful examination of the claims, the written description, and the prosecution history—the intrinsic evidence."[24]  Opinion evidence on claim construction is thus no better than opinion testimony on the meaning of statutory terms.[25]  The Court may, however, consult extrinsic evidence to aid its understanding of the patent.[26]  "[I]t is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to form the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field."[27]

**C.      Means-Plus-Function Limitations**

The parties agree that three of the disputed terms are means-plus-function limitations that should be governed by 35 U.S.C. § 112 ¶ 6.  Under this statute, an element in a claim may be expressed as a means for performing a specified function without reciting structure or material.[28]  The construction of a means-plus-function limitation is a two-step process.  First, the court must determine the claimed function.[29]  Second, the court must identify "what structures disclosed in the written description correspond to the 'means' for performing that function."[30]  A court must not read a means-plus-function claim element literally because then it  "could encompass any

---

[24]*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

[25]*Vitronics*, 90 F.3d at 1585.

[26]*Id.* at 1584 n.6.

[27]*Pitney Bowes*, 182 F.3d at 1309.

[28]35 U.S.C. § 112.

[29]*Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1360 (Fed. Cir. 2000).

[30]*Id.*

conceivable means for performing the function."[31]  Instead, a court must construe the functional

claim language to cover the structure, material, or acts in the specification and their

equivalents.[32]

## III.    Analysis

The parties ask the Court to construe the following eight terms, phrases, or clauses from

the '362 patent: (1) "invoicer," (2) "request for payment instructions," (3) "customer payment

instructions," (4) "directly," (5) "presentation," (6) "invoice presentation electronics," (7)

"invoice account number," and (8) "invoicer billing information."  In its motion to construct the

disputed claims, Emergis asks the Court to construe all eight of these claims.  In its response,

Cable One elected not to dispute the construction of: "invoicer," "request for payment

instructions," "presentation," "invoice presentation electronics," and "invoicer billing

information."  However, Cable One contends that "[b]y agreeing not to dispute these claim

limitations, Cable One does not concede that Emergis's construction of these terms is correct."[33]

Therefore, the Court will construe these undisputed claims for the parties.

The first seven terms appear in Claim 1 of the '362 patent and throughout its other

claims.  Claim 1 reads:

> An automated electronic invoicing and payment system for providing remote
> customer review of automated billing from an invoicer, wherein the customer
> payment instructions are sent from the customer directly to the invoicer, said
> system comprising:
> (a) invoice presentation electronics adapted to present customer billing data for

---

[31]*Valmont Indus. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993) (citing *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989)).

[32]*Id.*

[33](Doc. 62 at 5 n.1.)

customer review and to request payment instructions relating to automated billing to said customer; and
(b) a remote electronic customer authorization interface adapted to: (i) receive the customer billing data for customer review and the request for payment instructions from said invoice presentation electronics; (ii) provide the customer billing data for customer review and the request for payment instructions to the customer; (iii) receive customer payment instructions from the customer in response to the request for payment instructions; and (iv) transmit the customer payment instructions from the customer directly to said invoicer, said payment instructions including at least a customer invoice account number and an associated customer payment account.

The eighth term, "invoicer billing information," appears in Claim 10, which reads: "The system according to claim 1, wherein said billing data includes invoicer billing information."

The parties have also identified three terms, phrases, or clauses that should be governed by 35 U.S.C. § 112 ¶ 6,[34] as such terms are means-plus-functions limitations.  These are: (1) "means for receiving customer billing data," (2) "means for receiving customer payment instructions," and (3) "means for transmitting the customer payment instructions."  These terms, phrases or clauses appear in Claim 36 of the '362 patent, which reads:

A remote electronic customer authorization interface for an automated electronic invoicing and payment system for providing remote customer review of automated billing from an invoicer, wherein the customer payment instructions are sent from the customer directly to the invoicer said system comprising:
(a) means for receiving customer billing data for customer review and a request for payment instructions from said invoicer;
(b) means for receiving customer payment instructions from the customer in response to said request for payment instructions from said invoicer; and
(c) means for transmitting the customer payment instructions from the customer directly to said invoicer, said payment instructions including at least a customer invoice account number and an associated customer payment account.

---

[34]35 U.S.C. § 112 ¶ 6 reads: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

Each of these claims is discussed below.  First, the undisputed claims are discussed.  The disputed claims follow.

## A.     Undisputed Claims

Cable One elected not to dispute the construction of: "invoicer," "request for payment instructions," "presentation," "invoice presentation electronics," and "invoicer billing information."  However, Cable One contends that "[b]y agreeing not to dispute these claim limitations, Cable One does not concede that Emergis's construction of these terms is correct."[35] Thus, the Court must determine their construction.

### 1.        "invoicer"

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "invoicer" | a person, usually a business, who prepares an invoice detailing the goods and services provided to a customer, and the charges for such goods and services | a person, usually a business, who prepares an invoice detailing the goods and services provided to a customer, and then charges for such goods and services, and receives payment for those goods and services |

Emergis contends that Cable One's addition of "receives payment for those goods and services" adds a limitation that requires the business to receive actual payment, and that this limitation is contrary to the intrinsic evidence.  Emergis's proposed construction comes from the specification which states that an invoicer is "usually a business, who prepares an invoice detailing the goods and services provided and the charges therefor."[36]  Additionally, Emergis

---

[35](Doc. 62 at 5 n.1.)

[36](1:14–16.)

argues that the common and ordinary meaning of invoice is "an itemized list of goods shipped or services rendered, with an account of all costs,"[37] and the common and ordinary meaning of invoiced, invoicing and invoices is "to make an invoice of or submit and invoice to."[38]  Because the common and ordinary meaning of invoicer only contemplates the sending of an invoice and not the receipt of payment, the Court finds that Emergis's construction is more appropriate. Because the Court must give "claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art,"[39] the Court will construe "invoicer" in accordance with Emergis's proposed definition and omit Cable One's proposed language that requires the invoicer to receive payment.  Therefore, the Court will construe the term, "invoicer," as "a person, usually a business, who prepares an invoice detailing the goods and services provided to a customer, and the charges for such goods and services."

### 2.    "request for payment instructions"

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "request for payment instructions" | solicitation of an opportunity to make payment toward an outstanding balance | a request of the customer to pay an invoice from one of multiple customer payment accounts |

Emergis contends that the specification supports its construction.  The specification describes "to request payment instructions" as follows: "[t]his request provides the customer the opportunity to select either the bank account from which the invoice will be paid, or it provides

---

[37](Doc. 61 at 8 (citing WEBSTER'S II NEW COLLEGE DICTIONARY (2001)).)

[38]*Id.* (citing WEBSTER'S II NEW COLLEGE DICTIONARY (2001)).

[39]*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001).

the customer with the option to pay via a debit card, credit card, ATM, stored value card or some source of funds."[40]  Further, when the invoicer "requests payment instructions," the customer has the opportunity to do a number of things besides simply choosing among multiple customer accounts, as Cable One proposes.  The customer has the opportunity to modify pre-arranged payment instructions by changing the amount to pay, the date for payment, and the source of funds for the payment.[41]  Thus, because the language in the specification supports Emergis's construction, the Court will construe the phrase, "request payment instructions" as a "solicitation of an opportunity to make payment toward an outstanding balance."

### 3.     "presentation"

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "presentation" | providing customer billing data via electronic means and does not include the specialized definition normally associated with commercial paper | providing via electronic means an "invoice" containing at least the same customer billing data typically included on a paper invoice |

Emergis contends that the specification supports its construction.  First, the specification states that "'presentment' as used herein does not include the specialized definition normally associated with commercial paper."[42]  Second, Emergis argues that the specification allows for more flexibility in the types of information presented rather than Cable One's construction that requires "at least the same customer billing data typically included on a paper invoice."  The

---

[40](4:35–39.)

[41](7:61–66.)

[42](4:24–26.)

11

specification states that "[t]he billing information that may be submitted to the customer includes any combination of the following items: payment due date, amount due, detail of goods/services provided during a billing period, late charges, account information, customer information . . . , invoice identifier, e.g., invoice number."[43]  The specification also states that the "invoice would include billing data such as the customer name, address, account number and email address" and "*may* further include bill data typically included with a paper invoice to include the period covered by the invoice, a detail of the goods/services covered by the invoice, a total amount due and a payment due date."[44]  Based on the language in the specification, the construction of "presentation" need not limit the types of billing data to "at least the same customer billing data typically included on a paper invoice" as Cable One proposes.  Thus, the Court will construe the term, "presentation," as "providing customer billing data via electronic means and does not include the specialized definition normally associated with commercial paper."

    **4.**    **"invoice presentation electronics"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "invoice presentation electronics" | an electronic facility adapted to provide customer billing data | a device which provides an "invoice" electronically from the invoicer to the customer |

Emergis cites the specification to support its construction of this claim.  The specification states the automated billing system in the patent includes "invoice presentation electronics adapted to present customer billing data in request for payment instructions related to automated

[43](6:34–47.)

[44](4:40–45) (emphasis added).

12

billing."[45]  Additionally, for the same reasons it disputed the construction of "presentment,"

Emergis contends that Cable One's interpretation is too restrictive by using the term "invoice."

The specification states that the invoicer has flexibility in determining what customer billing data

to provide to the customer, and such information is not restricted to the information on an

"invoice."  Because the specification supports Emergis's construction, the Court will construe

the phrase, "invoice presentation electronics," as "an electronic facility adapted to provide

customer billing data."

     5.       **"invoicer billing information"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "invoicer billing information" | information relating to the customer's obligations to the invoicer, which may include the due date, amount due, list of goods and services, late charge | None |

Emergis argues that their construction is appropriate because the specification states that

"[t]he billing information that may be submitted to the customer includes **any combination** of

the following items: payment due date, amount due, detail of goods/services provided during a

billing period, late charges, account information, customer information . . . , invoice identifier,

e.g., invoice number."[46]  Because the specification supports Emergis's construction and Cable

One has not provided an alternative construction, the Court will construe "invoicer billing

information" as "information relating to the customer's obligations to the invoicer, which may

---

[45](5:26–29.)

[46](6:34–47) (emphasis added).

include the due date, amount due, list of goods and services, late charge**.**"

**B.      "directly"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|------------|------------------------|--------------------------|
| "directly" | the customer communicates payment instructions to the invoicer without reliance upon a third party acting independently from the invoicer | the customer communicates payment instructions to the invoicer without reliance upon or through a third party service provider |

The parties dispute the term "directly," a term that appears initially in Claim 1 and throughout the other claims.  Emergis contends that the term includes an invoicer's use of a third party service provider, like Crescent Systems, because such third party does not act "independently" from the invoicer.  Conversely, Cable One argues that the term precludes any third party from assisting the invoicer or the customer where the customer communicates payment instructions to the invoicer.  In support of their construction, the parties point the Court to the claim language, the specification, and the prosecution history.  As explained below, because these three sources support Cable One's proposed construction, the Court construes "directly" as "the customer communicates payment instructions to the invoicer without reliance upon or through a third party service provider."

*Claim Language*

Claim 1 describes the automated billing system as "providing remote customer review of automated billing from an invoicer, wherein the customer payment instructions are sent from the customer directly to the invoicer."  Cable One argues that the plain and ordinary meaning of "directly" supports its construction.  "Directly" is defined in the dictionary as "without the

intervention of a medium or agent; immediately; by a direct process or mode."[47]  Cable One argues that the patent inventor used "directly," meaning that the invoicer uses the automated billing system without the intervention of a medium or agent.

Emergis's proposed construction ignores the claim language and its plain meaning. Further, Emergis's proposed construction uses language that cannot be found anywhere in the claim, specification, or prosecution history.  Among the intrinsic evidence, the language, "third parties acting independently from the invoicer," cannot be found.  "'[T]he words of a claim are generally given their ordinary and accustomed meaning, unless it appears from the specification or the file history that they were used differently by the inventor."[48]  As shown below, the specification and the prosecution history, do not support an alternative meaning to the term, "directly."  Thus, the Court will construe "directly" as it is ordinarily defined, and as Cable One suggests.  Because the claim language uses the term, "directly," and does not specifically exclude "third parties acting independently from the invoicer," the Court finds that the claim language supports Cable One's proposed construction.

### Specification

Emergis contends that Cable One's definition conflicts with the inventor's preferred embodiment, and that this preferred embodiment is supported by the specification.  At the hearing, Emergis described the history of EIPP technology leading up to Mr. Neely's invention of the '362 patent.  Mr. Neely ("the inventor") developed the '362 patent in light of prior art, known as the Electronic Consolidator Model.  Under this system, a third party service provider

---

[47]OXFORD ENGLISH DICTIONARY ONLINE, Def. no. 5 (2d ed. 1989).

[48]*Fantasy Sports Props., Inc. v. Sportsline.Com, Inc.*, 287 F.3d 1108, 1114 (Fed. Cir. 2002) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1577 (Fed. Cir. 1993)).

presents an invoice to a customer on behalf of a business.  The customer then directs payment

from an account to the third party service provider.  Emergis contends that businesses did not

like this system because it allows a third party to insert itself into the relationship between the

business and the customer.  This Electronic Consolidator Model is disclosed in the specification

as Figure 1:

In the '362 patent, the inventor disclosed United States Patent Number 5,465,206,

invented by James J. Hilt ("the Hilt reference),[49] as an early example of a consolidator model.  In



FIG. 1
(PRIOR ART)

the system described by the Hilt reference, participating customers can pay bills to participating

invoicers via an existing payment network, such as a bank.  The payment network coordinates

the exchange of data and information between banks or other service providers acting on behalf

of each participating customer and invoicer.  Under this system, an invoicer sends the customer a

[49](Doc. 61, Ex. 2.)

bill that specifies payment amounts, due dates, account number, or other invoicer reference numbers.  Afterwards, customers initiate payment transactions to their banks or other service providers identifying the invoicers to whom payment should be sent, payment account information, payment amounts, and payment dates for each bill to be paid.  Unlike the system disclosed in the '362 patent, customers do not transmit their payment instructions to invoicers or other entities acting specifically on behalf of invoicers.  Hilt described his invention as: "Customers and billers participate in the bill pay system, but they need not deal with the many consumers or billers directly.  Instead, they need only deal with their bank, or other participating financial institution."[50]

In the language of the specification, the inventor contrasted his invention with these consolidator models.  The inventor explained the need for his system because systems using third party service providers to receive and transmit payment instructions between invoicers and customers added "a great deal of complexity and no small amount of expense to the process."[51] The inventor stated: "Thus, there exists a need for a simple, straight forward system and method of automated electronic invoicing and payment that *directly* involves the invoicer and the customer while, at the same time, *does not require a third party service provider* . . . ."[52]  The inventor referred to the system as described in Figure 1 as "cumbersome and time/labor intensive."[53]

---

[50](Doc. 61, Ex. 2 at 12:47–50.)

[51](1:31–32.)

[52](1:53–57) (emphasis added).

[53](4:18–19.)

The inventor also distinguished his invention from another patented invention issued to Anderson ("Anderson patent").[54]  In the Anderson patent,[55] the inventor stated that his invention could be used by third party bill payment services to collect payment from customers on behalf of product and service providers.[56]  Cable One contends that since the '362 patent inventor distinguished his invention from the Anderson patent, the '362 patent does not include a claim to a system where a third party service provider acts on behalf of an invoicer to collect payment from customers.

With the disclaimers of the Hilt reference and the Anderson patent, the inventor of the '362 patent created an EIPP system that allowed invoicers to deal directly with customers.  His system is shown in Figure 2:

---

[54](1:32–38.)

[55](Doc. 62, Ex. C.)

[56](*Id.* at 4:53–65.)



FIG. 2

While this system in the '362 patent omits the use of a third party service provider, Emergis contends that the language of the specification shows that the inventor allowed for outsourcing of certain functions of this system. The specification reads: "[A]n invoicer may choose to outsource webserver hosting or webserver and remittance processing to an outside company on behalf of the invoicer."[57] Thus, Emergis argues that when an invoicer outsources the EIPP services, payment transactions are processed by and through a vendor of the invoicer, who was selected by that invoicer rather than the customer, and who stands in the shoes of the invoicer for purposes of the EIPP transactions. Emergis argues that when this transaction occurs, the customer is interacting "directly" with the invoicer. Cable One refutes this argument by

---

[57](8:31–35.)

claiming that Emergis is reading this part of the specification out of context, and this text refers to outsourcing the information-technology function of hosting a webserver, not any arrangement where the customer transmits payment instructions to third party service providers.  The language of the specification does not refer to the outsourcing of payment instructions.  If the language did refer to such a system, a third party would be introduced, and the system in the '362 patent would function much like the consolidator systems that the inventor of the '362 patent disclaimed.  Thus, the Court agrees that while the specification allows for the outsourcing of certain functions of the EIPP system, the specification does not envision the outsourcing of the receipt of payment instructions.

As another example, Emergis notes that the specification reads: "In another embodiment, the electronic consumer authorization interface is a digital computer with the billing data and the payment request instructions presented by e-mail to the customer with an email reply for relaying customer payment instructions to the invoice presentation electronics."[58]  Emergis argues that Cable One's construction would exclude this EIPP system from the invention when a third party email service provider is involved.  However, the specification does not refer to the outsourcing of the email function as it would occur in the above-mentioned embodiment.  The specification only speaks to outsourcing webserver hosting or webserver and remittance processing.  Thus, this portion of the specification does not support Emergis's construction.

Finally, Emergis also claims that its construction of "directly" is the preferred embodiment of the claim in that it includes a third party vended system.  The inventor of the '362 patent was the founder and president of InvoiceLink, a third party provider of vended EIPP

---

[58](6:8–13.)

20

services to various invoicers in several industries.  Thus, Emergis argues that the inventor's use

of the patent was the preferred embodiment of the claim.  However, such evidence is extrinsic

evidence, and the Court may not rely on this evidence to contradict the meaning of claims

discernible from the intrinsic evidence.[59]  Emergis argues that claim interpretation that causes the

preferred embodiment to fall outside of the patent claim is "rarely, if ever, correct and would

require highly persuasive evidentiary support, which is wholly absent in this case."[60]  However,

the Court can distinguish *Vitronics* from this case.  In *Vitronics,* the court refused to accept the

proposed claim construction when it would exclude the only embodiment in the claim.[61]  In this

case, the '362 patent discloses other embodiments, such as a system in which the invoicer

operates the EIPP system on its own.  Thus, unlike *Vitronics*, an exclusion of this embodiment

would still allow coverage of other embodiments.  Thus, the Court finds that the specification

history supports Cable One's proposed construction for the term, "directly."

### *Prosecution History*

In the original application for the '362 patent, the inventor's claims did not include the

term, "directly."  The inventor added this term after his first application was rejected by the

Examiner as unpatentable over the Hilt reference.  In response to the First Office Action,

rejecting the inventor's patent application, the inventor interviewed with the patent examiner on

January 25, 1999.  During this meeting, the parties agreed that the pending claims should be

amended "to reflect that customer is directly communicating the invoice related matter with the

---

[59]*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

[60]*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

[61]*Id.*

invoicer."[62]  On February 12, 1999, the inventor filed an amendment, incorporating this

agreement.  Each of the independent claims of the application was amended to require that

customer payment instructions be transmitted "directly" to its invoicer.[63]  In this amendment, the

inventor explained:

> Consistent with the above interview, the independent claims have been amended
> to recite that the customer directly communicates the invoice related matter to the
> invoicer.  As discussed during the interview, unlike the prior art of record, the
> present invention eliminates the problems associated with using a third party
> service provider.[64]

The above language supports Cable One's proposed construction in that the inventor, by adding

the term, "directly," disclaimed all third party systems, not just third party service providers

acting on behalf of customers.

In the Second Office Action, the Examiner again rejected all of claims as being obvious

over the Hilt reference, finding that the inventor's amendment and accompanying arguments

were "not persuasive."[65]  Referring to the Hilt reference, the Examiner found that it would have

been obvious to one of ordinary skill in the art to modify the disclosed invention of Hilt to

provide for direct communication from customers to invoicers, because such direct

communications would be preferred by customers, would be more convenient and faster, and

would eliminate the need for intervention by third parties.[66]

In response to the Final Office Action, the inventor again amended his application and

---

[62](Doc. 61, Ex. 4.)

[63](Doc. 61, Ex. 5.)

[64](Doc. 61, Ex. 5 at 9–10.)

[65](Doc. 61, Ex. 6 at 3.)

[66](Doc. 61, Ex. 6 at 4.)

distinguished the claimed inventions from the Hilt reference.  Discussing the addition of the term, "directly," the inventor reminded the Examiner that the claims require direct communication of invoice-related matter to the invoicer, and for that reason, "unlike the [consolidation model of the Hilt reference], the present invention eliminates the problems associated with using a third party service provider."[67]

In an Advisory Action, the Examiner acknowledged that the inventor had previously argued that the present invention required direct communication from a customer to an invoicer, but that he had failed to submit appropriate amendments regarding that limitation.[68]  Without such limitation, the Examiner would not allow the claims.  Afterwards, the applicant submitted supplemental amendments to all independent claims to include the "directly" language in the claims.[69]  Based on these amendments, the Examiner issued a Notice of Allowability for all pending claims, and the '362 patent was issued on March 28, 2000.

Emergis contends that these amendments and arguments were made solely for the purposes of more clearly distinguishing the prior art—a system in which a customer might initiate payment transactions to several invoicers via a customer-selected third-party service provider such as the customer's bank.  Emergis contrasts the system in the '362 patent because it requires that customers communicate "directly" with the invoicer for purposes of receiving and reviewing invoice information, and for initiating appropriate payment transactions.  Emergis contends that the '362 patent does not preclude an invoicer's use of a third-party vendor to

---

[67](Doc. 61, Ex. 7 at 2.)

[68](Doc. 61, Ex. 8 at 2.)

[69](Doc. 61, Ex. 9.)

operate an EIPP system on behalf of that invoicer.  In fact, Emergis argues that the patent specifically contemplates that this is the preferred way to practice the invention.  Thus, Emergis argues, to the extent the relationship between the invoicer and its third-party EIPP vendor is more or less transparent to the customers of the invoicer, such a facility clearly falls within the scope of the claims.

However, the prosecution history fails to support Emergis's arguments.  There is nothing in the prosecution history that states when a third-party EIPP vendor is transparent to the customer, such a system falls within the scope of the claim.  The inventor inserted the term, "directly," in order to gain patent approval by the Examiner.  Throughout the prosecution history, there is no clarification by the inventor that the term, "directly," should be construed as "without reliance upon a third party acting independently from the invoicer."  Instead, when the inventor added the term, "directly," the Examiner approved this amendment and provided the following statement for his reasons: "[t]he prior art does not teach or suggest: . . . transmitting said instruction directly to the invoicer . . . ."[70]  After the Examiner made this statement, the inventor made no further amendments nor did he seek to clarify the Examiner's statement to ensure that invoicers acting "without reliance upon a third party acting independently from the invoicer" were included within the scope of the claim.[71]  Because the prosecution history shows that the claims were approved with the understanding that no third parties were involved in this process, Cable One's proposed construction of "directly" is the more appropriate construction.

---

[70](Doc. 62, Ex. 1 at 4.)

[71]*See Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1375 (Fed. Cir. 2004) (declining to "rewrite unambiguous patent claim language" when "[t]he patentee made no attempt to have such an error corrected, either by obtaining a certificate of correction from the Patent and Trademark Office pursuant to 35 U.S.C. § 255, or by action of the district court.") (citation omitted).

The Court notes Emergis's argument that its construction of "directly" is more appropriate because it is the same definition used by Cable One in its automated billing system. Emergis points the Court to Cable One's website, which tells customers: "Your payment goes directly from your bank to Cable One."  Although Crescent Systems is involved in this process, Emergis argues that even Cable One uses the term, "directly" to describe this EIPP system. However, this evidence is extrinsic evidence that the Court may not rely on "to contradict the meaning of claims discernible from thoughtful examination of the claims, the written description, and the prosecution history—the intrinsic evidence."[72]  Because the intrinsic evidence supports Cable One's proposed construction, the Court will not look to such extrinsic evidence to contradict the meaning of this term.

### Disclaimer of Subject Matter

Emergis also contends that by including the "directly" language, the inventor never disclaimed the use of a third-party vendor by an invoicer to maintain an EIPP system on behalf of the invoicer.  "'[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.'"[73]  But Emergis contends that it did not unequivocally disclaim the use of a third-party vendor.  However, there is nothing the prosecution history to support this limited disclaimer with the addition of the term, "directly." The inventor could have made a statement during the prosecution that the "directly" amendments were meant only to exclude "third party service providers acting independently from the

---

[72]*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999).

[73]*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)).

invoicer," rather than any third party vendor.  But no such statement was made.  The Federal Circuit has found that:

> it frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art.  In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to.[74]

In this case, the inventor amended the claims to include the term, "directly," and thereby disclaimed the use of third parties in this invention.  Because the inventor did not clarify that the term, "directly," should be construed as Emergis suggests, there is no support in the prosecution history for such a construction.  The Court finds that Cable One's proposed construction is supported by the prosecution history, as well as the claim language and the specification.  Therefore, the Court will construe the term, "directly," as "the customer communicates payment instructions to the invoicer without reliance upon or through a third party service provider."

**C.    "invoice account number"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "invoice account number" | a number or other identifier associated with the customer's account for its purchase of goods and services from the invoicer | a unique number that is an invoice identifier, *i.e.*, an invoice number |

Emergis contends that "invoice account number" means "account number" or "customer number," while Cable One asserts that it means "invoice number."  Claim 1 states that the "payment instructions include[ ] at least a customer invoice account number and an associated

---

[74]*Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1362 (Fed. Cir. 2005).

customer payment account." Emergis contends that the "customer payment account" is the customer's bank account or other source of funds from which the invoice will be paid, and the "invoice account number" is the number or other identifier associated with the customer's account.

The parties agree that the specification makes a distinction between "customer account identifier" which is equivalent to "customer number" and/or "account number" and "invoice identifier" which is equivalent to "invoice number." The disputed phrase, however, contains terms from both phrases. By including both "account" and "invoice" in this term, the inventor of the patent introduced an ambiguity.

Cable One cites two examples in the specification when "invoice account number" is used interchangeably with "invoice number." In the summary of the invention, the specification states: "the payment instructions include[] at least an invoice account number and an associated customer payment account."[75] In the following paragraph, the specification reads: "the payment instructions include[] at least a customer invoice number and an associated customer payment account."[76] In comparing these two citations, invoice account number and customer invoice number were used interchangeably. Cable One also points the Court to the preferred embodiment in the specification that reads: "The information included in this electronic authorization could include the customer invoice number and an associated customer payment account. In a preferred embodiment, both these items of information are submitted

_____

[75] (2:43–45.)

[76] (3:1–3.)

27

simultaneously with the authorization."[77]  Because the inventor used the phrase, "invoice account number" interchangeably with "customer invoice number," and this phrase is never used interchangeably with "account number" or "customer number," the Court determines that "invoice account number" means "invoice number."[78]

In support of its position, Emergis cites a Federal Circuit case, *Amhil Enterprises Ltd. v. Wawa, Inc.*, that held when an original modifier is disregarded, but the specification "leaves its reader with the impression that" the term without the initial modifier "mean[s] essentially the same thing" as the phrase without the modifier, then both terms are construed as having the same meaning.[79]  Thus, Emergis contends that when "invoice number" is used without "account," "invoice number" means essentially the same thing as "invoice account number."  However, the case Emergis cites is distinguishable from this case.  In *Amhil*, the patentee used the phrase, "substantially vertical face" interchangeably with "vertical face."[80]  The court found the entire specification as a whole left the reader with the impression that "substantially vertical" and "vertical" mean essentially the same thing.[81]  In this case, reading the specification as a whole, the reader is not left with the impression that "invoice account number" means essentially the same thing as "invoice number."  In *Amhil*, the addition of "substantially" was an unnecessary modifier that did not change the essential meaning of the term.  In this case, the addition of

---

[77](4:59–63.)

[78]*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 968 (Fed. Cir. 2000) (construing two terms in the same manner when they are used interchangeably in the specification).

[79]*Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1559 (Fed. Cir. 1996).

[80]*Id.*

[81]*Id.*

"account" is a necessary term that changes the essential meaning of the phrase.  Therefore, in this case, the Court cannot follow the reasoning of *Amhil* as Emergis suggests.

The prosecution history also supports Cable One's proposed construction.  In the First Office Action, the Patent Examiner objected to the term "invoice account number" in the specification because he found the phrase to be ambiguous.[82]  The inventor responded by amending the specification.  The phrase, "an invoice number" was changed to "customer invoice number" to clearly show what he meant by the phrase "invoice account number."[83]  After these claims were approved by the Examiner, he stated "[t]he prior art does not teach or suggest: . . . the customer entering (receiving in customer authorization interface) the instructions including at least the *invoice number* and customer's requisite/associated payment account . . . ."[84]  Because the applicant never submitted anything afterwards to the Examiner contending that this statement misunderstood the scope of the invention, the Examiner's use of "invoice number" supports construing the term, "invoice account number," as "invoice number."[85]  Because both the specification and the prosecution history support Cable One's proposed construction, the Court will construe the phrase, "invoice account number" as "a unique number that is an invoice identifier, *i.e.*, an invoice number."

### D.    "payment instructions"

---

[82](Doc. 62, Ex. D at 4.)

[83](Doc. 62, Ex. F at 3.)

[84](Doc. 62, Ex. L at 4.)

[85]*Nazomi Comm'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) (finding that any construction of a term must be consistent with the examiner's findings).

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Construction | Cable One's Construction |
|---|---|---|
| "payment instructions" | data entered by the customer that may include information such as a selected method or source of payment, a payment account number or other identifier, payment amount, comments or initiation date | data relating to a customer's authorized payment to an invoicer, which includes at least an invoice number and a customer payment account |

The parties agree that this phrase should be construed as data relating to the customer's authorized payment. However, the parties dispute the content of these instructions. Cable One contends that the "customer payment instructions" must include two pieces of information—the invoice account number and the customer payment account, while Emergis contends that the data can include any combination related to the customer's payment. Emergis states that the customer may, but is not required, to include the invoice account number or customer payment account.

Claim 1 reads: "transmit the customer payment instructions from the customer directly to said invoicer, said payment instructions including *at least* a customer invoice account number and an associated customer payment account."[86] Claim 36 similarly states that the remote electronic customer authorization interface is a "means for transmitting the customer payment instructions from the customer directly to said invoicer, said payment instructions including *at least* a customer invoice account number and an associated customer payment account."[87] According to the claim language, the construction should include at least both of these pieces of

---

[86]Claim 1 (emphasis added).

[87]Claim 36  (emphasis added).

information.

The specification shows that the customer payment instructions may, but need not always, include this information.  However, in the preferred embodiment, both the customer invoice number and customer payment account are included in the customer payment instructions.  The specification states that "[t]he information included in this electronic authorization could include the customer invoice number and an associated customer payment account.  In the preferred embodiment, both these items of information are submitted simultaneously with the authorization."[88]  Therefore, based on the plain meaning of the claim language and the preferred embodiment of the specification, the Court finds that "customer payment instructions" includes at least these two pieces of information.  The Court will construe "customer payment instructions" as "data relating to a customer's authorized payment to an invoicer, which includes at least an invoice number and a customer payment account."

**E.    "means for receiving customer billing data"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Proposed Function | Cable One's Proposed Function |
|---|---|---|
| "means for receiving customer billing data" | to receive customer billing data, as that term is properly construed, for presentment | to receive customer billing data for customer review and a request for payment instructions |
| | **Emergis's Proposed Corresponding Structure** | **Cable One's Proposed Corresponding Structure** |
| | - webserver database<br>- remote authorization terminal<br>- relational database | - webserver<br>- remote authorization terminal |

Cable One agrees that this phrase should be construed "to receive customer billing data"

---

[88](4:61– 64.)

but contends that this term also includes the step of "receiving payment instructions." To support this assertion, Cable One cites directly from Claim 36 which states: "means for receiving customer billing data for customer review and a request for payment instructions from said invoicer." Thus, Cable One argues that Emergis's proposed construction is an incomplete recitation of the claim function without "request for payment instructions."

Emergis contends that the specification makes clear that "means for receiving customer billing data" and "request for payment instructions" are separate functions. The specification reads: "*after* electronic invoice presentment, the customer provides an electronic authorization to the invoicer permitting customer's account to be charged."[89] Thus, the request for payment instructions is not a requirement for receiving customer billing data, but is only part of the process of bill payment. The Court agrees with Emergis that the claim describes two separate functions, and that the specification supports Emergis' proposed construction. Therefore, the Court will construe "means for receiving customer billing data" as "to receive customer billing data, as that term is properly construed, for presentment."

The parties also dispute the proposed structure. First, Cable One contends that the webserver, rather than the webserver database as Emergis proposes, is more accurately part of the corresponding structure. The webserver is a structural component disclosed in the specification while the webserver's database is where that data is stored once received. Emergis contends that the webserver database is a structure for receiving customer billing data by citing the specification: "[t]he webserver database hosts an interactive session in which the customer accesses their invoice. The customer may choose to modify pre-arranged payment

---

[89](4:52–54) (emphasis added).

arrangements. As an example, the customer may change the amount to pay, the date for payment and changing the sources of funds for the payment, from a personal checking account to another invoicer-approved source, such as a credit card.  These arrangements are stored on the webserver database."[90]  The specification supports Cable One's argument that the webserver database is a storage facility, rather than a means for receiving customer billing data.  Thus, the Court cannot find that a webserver database is a corresponding structure.

Cable One also challenges Emergis's inclusion of a "relational database" as a corresponding structure.  Cable One cites the specification that states that the relational database stores legacy data.[91]  It does not appear from the specification that the relational database actually receives customer billing data, and the Court will omit "relational database" from the list of corresponding structures.  Therefore, the Court construes the corresponding structures as: a webserver and a remote authorization terminal.

**F.    "means for receiving customer payment instructions"**

The parties' only dispute over the construction of this term is how "customer payment instructions" should be construed.  As discussed above, the Court will construe "customer payment instructions" as "data relating to a customer's authorized payment to an invoicer, which includes at least an invoice number and a customer payment account."  Therefore, the Court will construe "means for receiving customer payment instructions" as "receiving data relating to a customer's authorized payment to an invoicer, which includes at least an invoice number and a customer payment account, in response to the request for payment instructions."  Because the

---

[90](7:59–67.)

[91](7:32–36.)

parties do not dispute the corresponding structures, the Court will construe the corresponding structures as including: an internet website, email, electronic facility allowing for customer input and editor for modifying the preauthorized payment instructions.

**G.     "means for transmitting customer payment instructions"**

The differences between the parties' proposed claim interpretations are as follows:

| Claim Term | Emergis's Proposed Function | Cable One's Proposed Function |
|---|---|---|
| "means for transmitting customer payment instructions" | to transmit instructions from the customer to the invoicer | to transmit instructions (as properly defined) directly to the invoicer (as properly defined) |
| | **Emergis's Proposed Corresponding Structure** | **Cable One's Proposed Corresponding Structure** |
| | - internet website<br>- a telephone and a telephone processing switch<br>- an automated teller (ATM)<br>- a kiosk<br>- a personal computer (PC)<br>- an interactive TV | - internet website<br>- a telephone and a telephone processing switch<br>- an automated teller (ATM)<br>- a kiosk<br>- a personal computer (PC)<br>- an interactive TV |

Cable One argues that its proposed function is the proper construction because it comes straight from the claim language. Claim 36 reads: "means for transmitting the customer payment instruction from the customer directly to said invoicer." Emergis responds that the specification provides that one aspect of the present invention is to provide a remote electronic authorization interface for an automated electronic invoicing and payment system . . . including . . . (c) means for transmitting the customer payment instructions from the customer to the invoicer, the payment instructions including at least an invoice account number and an associated customer

payment account."[92]  Thus, Emergis argues that it is unreasonable to add this limitation,

"directly" into the claim.  But the plain language of the claim supports Cable One's construction.

The inventor included this limitation by adding "directly" to the claim language, and the Court

will adopt the language of the claim in its construction.  Therefore, the Court will construe

"means for transmitting customer payment instruction" as "to transmit customer payment

instructions directly to the invoicer."

 Because the parties agree to the corresponding structures, the Court will construe the

corresponding structures as an internet website, a telephone and a telephone processing switch,

an automated teller (ATM), a kiosk, a personal computer (PC) and an interactive TV.

## IV. Conclusion

 At the parties' request, the Court has construed the disputed patent claim language in this

action.  Based on the parties' submissions and the evidence presented at the hearing, the Court

has analyzed the disputed claim terms, and has determined that the disputed claim language

should be construed in accordance with this Order.

 **IT IS THEREFORE ORDERED BY THE COURT** that the disputed terms and

phrases of the '362 patent is construed as set forth in this Order.

 IT IS SO ORDERED.

 Dated this  _14th_  day of September 2006.


     S/ Julie A. Robinson_____
    Julie A. Robinson
    United States District Judge

---

[92](2:34–46.)

35

Memorandum Order Construing Disputed Claims, *Emergis Tech., Inc. v. Cable One, Inc.*, No. 05-4069-JAR.